**The below described is SIGNED.**

**Dated: June 18, 2006**

**JUDITH A. BOULDEN
U.S. Bankruptcy Judge**



# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br>**ROBERT C. RICHARDS,**<br>Debtor. | Bankruptcy Number: 05-22449<br>Chapter 7 |
| **KENNETH A. RUSHTON, CHAPTER 7 TRUSTEE**<br>Plaintiff,<br>vs.<br>**DAVID RICHARDS,**<br>Defendant. | Adversary Proceeding No. 05-2350 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Chapter 7 Trustee Kenneth A. Rushton (Trustee) has filed a First Amended

Complaint seeking to avoid and recover two transfers made between the debtor, Robert Richards,

I:\LAW\OPINIONS\Opin0482.wpd

(Debtor), and the defendant David Richards, who is the Debtor's brother (Brother). The Trustee claims that these two transfers are avoidable under 11 U.S.C. §§ 544, 547, and 548,[1] and the Uniform Fraudulent Transfer Act (UFTA),[2] as preferential and fraudulent transfers. On May 8, 2006, the Court granted the Brother's Summary Judgment motion declaring that, as to all of the causes of action that the Trustee asserted, the Brother did give reasonably equivalent value for the transfers relating to a 1997 Porsche 911 Carrera (First Porsche). As a result of this ruling, the only issues that remained for trial are whether a $1,000 down payment the Debtor paid to Ken Garff Motors for the benefit of the Brother and a $16,000 trade-in credit also given to the Brother (collectively the Transfers) were transfers made with the actual intent to hinder, delay, or defraud creditors, and whether the transfer of the $16,000 trade-in credit was a preferential transfer.

A trial was conducted and the proceeding was taken under advisement. This is a core matter and the Court may enter a final judgment.[3] The Court has considered the evidence properly before it, has judged the credibility of the witnesses, and has made an independent inquiry into the applicable case law. For the reasons set forth below, the Court determines that the Transfers were neither preferential nor fraudulent, and may not be avoided by the Trustee.

---

[1] All future statutory references are to title 11 of the Bankruptcy Code unless otherwise indicated.

[2] The UFTA has been adopted by the state of Utah and codified as Utah Code Ann. §§ 25-6-1 et seq. All future references to the UFTA refer to this section of the Utah Code.

[3] 28 U.S.C. §§ 157(b)(2)(F) and (H)

## I.  FINDINGS OF FACT

A.  **The First Porsche**

In May 2003, the Debtor offered to sell the First Porsche to his Brother for $6,000. The Brother, who was aware that the Debtor was experiencing financial difficulties,[4] agreed to buy the First Porsche viewing it as a way that he could provide financial assistance to the Debtor. While researching on the Internet, the Brother later discovered that the First Porsche was actually worth $16,000. Therefore, in order to ensure that he gave fair value for the First Porsche, the Brother proposed changing the terms of the agreement with the Debtor in order to increase the purchase price to $16,000. Although reluctant at first, the Debtor eventually agreed to the price increase.

Due to the fact that the Brother believed the First Porsche was unreliable, the parties decided that, rather than taking possession of the First Porsche, the Debtor would continue to use the vehicle until the Brother found another car he wanted to purchase. Once he did this, the First Porsche would then be used as a trade-in with the proceeds being applied to whatever car the Brother was then purchasing. The Debtor, therefore, retained possession of the First Porsche and the title to the vehicle remained in his name, although the Brother testified that he was able to use the vehicle any time he desired. The Debtor also continued to insure the First Porsche under his own automobile insurance policy.

Over the next two years, the Brother made a series of payments in varying amounts that eventually totaled $16,500 to the Debtor for the First Porsche. The Brother made these payments by writing checks to cash and then paying the cash directly to the Debtor's secretary,

---

[4]  Although the Debtor, who is a doctor, had apparently been dropped from his employer's insurance plan, the parties never explained in detail exactly what was causing his financial difficulties.

who would then provide him with a receipt for the payment. The Brother chose to pay the Debtor in cash rather than by check due to his belief that, despite the fact the parties had agreed to the purchase price increase, the Debtor might not cash the checks the Brother wrote to him. In the past when the Brother had given the Debtor checks for other purposes, the Debtor would often not negotiate them. The Brother, therefore, chose to pay for the First Porsche in cash in order to ensure that the Debtor would receive the entire amount of the purchase price consistent with his desire to financially assist the Debtor. The Brother made the last payment on the First Porsche on August 26, 2004.

### B. The Transfers

Eventually, the Brother located another 1997 Porsche (Second Porsche) at Ken Garff Motors that he decided to purchase. On August 18, 2004, the Debtor made a $1,000 down payment to Ken Garff Motors on this Second Porsche for which he was later reimbursed.[5] Nine days later, the Debtor transferred title to the First Porsche [which, at this point, the Brother had fully paid for] to Ken Garff Motors with the proceeds from this trade-in being applied to the Brother's purchase of the Second Porsche. The trade-in credit and the down payment are the two Transfers that the Trustee seeks to avoid. The parties have stipulated that the Debtor was insolvent at the time of the Transfers.

The Brother bought the Second Porsche on August 27, 2004, the same day that the Debtor transferred the title of the First Porsche to Ken Garff Motors. The purchase price of the

---

[5] The evidence is unclear why the Debtor made this down payment on his Brother's behalf. The Brother testified that he asked the Debtor to make the down payment and that he would reimburse him for it. There was some discussion regarding a check dated October 28, 2004, for $1,000. The Brother testified that this check possibly could have been to reimburse the Debtor, but that he could not recall for sure. He testified that he did, however, remember reimbursing the Debtor for the down payment at some point.

Second Porsche was $48,925. After taking into account the $16,000 trade-in credit on the First Porsche and the $1,000 down payment, the Brother still owed $31,925, which he financed through a loan from Family First Credit Union. The Brother was not able to complete the closing on the Second Porsche because he was required to return to work. He, therefore, called the Debtor who went to the dealership and signed the documents necessary to complete the purchase including the contract of sale. It was the Brother, however, who took title to the Second Porsche and insured it under his automobile insurance policy with State Farm.

Shortly after the purchase of the Second Porsche, the Debtor's own car was damaged in an accident and rendered unusable leaving him without a means of transportation. As a result of this accident, the Brother decided to allow the Debtor to use the Second Porsche. The Debtor has continued to use the Second Porsche since that time and currently has possession of it at his new home in Indiana.

Due to the fact that he had allowed the Debtor to use the Second Porsche, the Brother asked the Debtor to make the monthly $619 car loan payment to Family First Credit Union. The Debtor has continued to experience financial difficulties, however, so he has only made the payments using his own money during those times in which he was actually working. The rest of the time, the money the Debtor used to make the car payments actually came from the Brother, who had continued to provide financial support to the Debtor after the Transfers.[6]

The Debtor filed for bankruptcy on February 22, 2005, and listed on his schedules the transfer of the First Porsche to Ken Garff Motors stating that it was "[w]orth $6,000 as a trade-in." The Trustee filed his original complaint against the Brother on May 31, 2005, seeking to

---

[6] Between August 27, 2004, and February 22, 2005, when the Debtor filed for bankruptcy, the Brother gave his brother checks totaling $11,500.

avoid the transfer of the First Porsche as fraudulent. After taking the Brother's deposition in association with the Debtor's bankruptcy case, the Trustee filed his First Amended Complaint on November 28, 2005, this time alleging that the Transfers are avoidable under §§ 544, 547, 548, and the UFTA. On May 8, 2006, the Court granted Summary Judgment in favor of the Brother ruling that, for all transfers related to the First Porsche, the Brother did pay the Debtor reasonably equivalent value and the Debtor's estate was not diminished by these transfers.

The Court held a trial on May 25, 2006, during which the Trustee argued that the Transfers could be avoided as preferential and fraudulent. Specifically, the Trustee attempted to prove that the Debtor owed an antecedent debt to the Brother and that he made the Transfers with the actual intent to defraud creditors.[7] The Brother denied these allegations and, as to the preferential claims, affirmatively asserted all defenses available under § 547 including a contemporaneous exchange for new value.[8]

A large part of the Trustee's case focused on his argument that the Debtor made the Transfers on account of an antecedent debt that he owed to his Brother. The Court finds that there was no antecedent debt that the Debtor owed to his Brother since the Debtor was the creditor in the Transfers. It was the Brother who owed a debt since he was the one required to make payments.

Additionally, the Trustee argued that the Transfers were made with the actual intent to defraud creditors because they were made to an insider; the agreement between the parties was

---

[7] The Trustee's case was hampered at the outset by numerous problems including the fact that he failed to subpoena the Brother and was, therefore, unable to call him as a witness since he was not present in the courtroom at the start of the trial. Additionally, the only other witness the Trustee attempted to call to testify was not included on the Trustee's witness list and was, thus, excluded from testifying.

[8] Section 547(c)(1)

I:\LAW\OPINIONS\Opin0482.wpd     6

never formalized so the Transfers were allegedly concealed; the Debtor retained possession of the property transferred after the transactions; and the Debtor was insolvent at the time of the Transfers. The Trustee, however, is incorrect that the Debtor retained control of the property transferred or that the Transfers were concealed. The Trustee erroneously believes that because one Porsche was traded in for another, and because the Debtor is currently in possession of the Second Porsche, that this somehow means he has retained possession of the property transferred. This is simply not the case. The property transferred, as the Trustee's counsel correctly explained at trial, was the trade-in credit and the down payment. The Debtor did not retain possession of either of these after the Transfers. The Trustee also argues that since the agreement to purchase the First Porsche was never formalized as a written contract the Transfers were concealed. However, just because the agreement was not formalized does not mean the parties attempted to conceal the Transfers. The fact that the Transfers were made in the context of a purchase involving a third-party dealership suggests just the opposite. Furthermore, the fact that the Brother paid reasonably equivalent value for the First Porsche, the Debtor was reimbursed for the down payment,[9] and the Debtor was acting as the creditor in these Transfers demonstrate to the Court that the Transfers were not made with the actual intent to defraud creditors. The Court, therefore, is also unpersuaded by the Trustee's argument as to actual fraud under both the UFTA and § 548.

---

[9] The Trustee attempted to argue that the reimbursement for the down payment eventually came from the Brother's business rather than him personally. For the reasons discussed below, the Court finds it unimportant how the Debtor was reimbursed.

## II. CONCLUSIONS OF LAW

The Trustee asserts three theories for avoiding the Transfers at issue: (1) under § 544 and the UFTA, the Transfers are avoidable as fraudulent; (2) under § 547, the transfer of the $16,000 trade-in credit is avoidable as preferential; and (3) the Transfers were made with the actual intent to defraud creditors and may be avoided under § 548. The Court will discuss each theory in turn.

### A. Utah Code Ann. § 25-6-6(2) is inapplicable to the Debtor

The Trustee, using the powers granted to him by § 544(b)(1), argues that under the UFTA the Transfers are avoidable as fraudulent. Specifically, the Trustee asserts that the Transfers are avoidable under § 25-6-6(2) of the UFTA, which states:

> A transfer *made by a debtor* is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.[10]

In order to be a fraudulent transfer under applicable state law, therefore, the first thing required is that there is a transfer by a debtor.

In this case, the Trustee has failed to establish that the Transfers are avoidable under § 544 and the UFTA since the Transfers were by a creditor, not a debtor. Section 25-6-2 of the UFTA defines a "debtor" as "a person who is a liable on a claim,"[11] and a "creditor" as "a person who has a claim."[12] A "claim" is defined in this section as, essentially, "a right to payment."[13] Applying these definitions to the parties involved in the Transfers at issue makes it clear that the

---

[10] Emphasis added.

[11] Utah Code Ann. § 25-6-2(6)

[12] Utah Code Ann. § 25-6-2(4)

[13] Utah Code Ann. § 25-6-2(3)

Brother was the debtor as defined by the UFTA, while the Debtor was, in fact, the creditor.[14] In these Transfers, the Debtor was the individual with the right to a payment while the Brother was the one who was liable to make payments for both the First Porsche and to reimburse the Debtor for the down payment on the Second Porsche. By transferring the trade-in credit to his Brother, the Debtor was simply fulfilling his obligation as a creditor to provide the goods that the Brother had properly purchased. In making the $1,000 down payment on his Brother's behalf, which he did on the basis that the Brother would reimburse him, the Debtor was again acting as a creditor since he became entitled to a reimbursement and, thus, had a claim for repayment.[15] Simply put, the Debtor was the creditor and Brother was the debtor in these Transfers. Therefore, § 25-6-6(2), which only applies to transfers by a debtor, is inapplicable in this case.

### B.    There Was No Antecedent Debt for § 547 Purposes

The Trustee also claims that the transfer of the $16,000 trade-in credit is avoidable as a preferential transfer under § 547. The Trustee bears the burden of proving by a preponderance of the evidence that the transfer was preferential under this section.[16] A preferential transfer under § 547 is a transfer of a debtor's interest in property to or for the benefit of a creditor, on account of an antecedent debt, made while the debtor is insolvent and within the applicable time period, which enables the creditor to receive more than he would have in a hypothetical chapter

---

[14]    The Debtor has been described as the "debtor" throughout this adversary proceeding, which has led to some confusion. The application of this term to the Debtor is only in reference to his status in his bankruptcy case.

[15]    It does not matter, therefore, that the Debtor may have been reimbursed by his Brother's business rather than the Brother personally. Regardless of how he was reimbursed, the Debtor became a creditor at the time he made the down payment.

[16]    *See Ogden v. Hazen (In re Ogden)*, 243 B.R. 104, 110 (10th Cir. B.A.P. 2000)

7 liquidation.[17]  The Brother, as a relative of the Debtor, is considered an insider.[18]  Therefore, the applicable time period for determining whether this transfer was preferential is "between ninety days and one year" prior to the filing of the Debtor's bankruptcy petition.[19]  The transfer of the $16,000 trade-in credit does fall within this time period.

The language of § 547 states that the transfer must be "for or on account of an antecedent debt *owed by the debtor*."[20]  The Bankruptcy Code defines a "debtor" as a "person . . . concerning which a case under this title has been commenced."[21]  Therefore, for purposes of the Trustee's claim under § 547, the Debtor is the person described in the statute, and the issue is whether there was an antecedent debt that he owed.

As discussed above, it was the Brother that owed the debt to the Debtor and not the reverse.  The Bankruptcy Code, like the UFTA, defines a "debt" as a "liability on a claim,"[22] and a "claim" as "a right to payment."[23]  It also defines a "creditor" as an "entity that has a claim against the debtor."[24]  In the present case, the Brother was the one who was liable on the claim and required to make payments on the First Porsche.  At no point did the Brother have a right to payment from the Debtor that would justify labeling the Brother as a "creditor."  It was the

---

[17]   Section 547(b).

[18]   Section 101(31)(A)(i).

[19]   Section 547(b)(4)(B).

[20]   Section 547(b)(2) (emphasis added).

[21]   Section 101(13).

[22]   Section 101(12).

[23]   Section 101(5).

[24]   Section 101(10)(A).

Debtor who had the right to payments, and there simply was no antecedent debt that he owed in regards to the transfer of the $16,000 trade-in credit. Therefore, since a transfer must meet all of the criteria of § 547(b) to be preferential,[25] the Trustee's failure to establish the existence of "an antecedent debt owed by the debtor" defeats his attempt to avoid the transfer of the $16,000 trade-in credit under § 547.[26]

### C. There Was No Actual Intent to Defraud Creditors

Finally, the Trustee argues that the Transfers were made with the actual intent to delay, hinder or defraud creditors, and, therefore, may be avoided under § 548(a)(1). Actual fraudulent intent requires a purposeful act intended specifically to defraud creditors, and it is the Trustee's burden to prove this intent.[27] The UFTA contains a non-exclusive list of eleven "badges of fraud" developed to assist courts in determining whether the requisite fraudulent intent is present in a given transaction. For purposes of § 548(a)(1), "bankruptcy courts consider similar badges of fraud as evidence of actual fraudulent intent."[28] Therefore, the Court will look to the UFTA badges of fraud for assistance in determining whether the Trustee may avoid the Transfers as fraudulent under § 548(a)(1).

---

[25] *In re Ogden*, at 110.

[26] Since the Trustee has failed to meet his burden under § 547, the Court will not address the affirmative defenses the Brother has asserted under this section.

[27] There was a disagreement at trial between the Trustee and the Brother's counsel over the applicable standard for § 548 cases. The Trustee argued that he can meet his burden by proving his case by a preponderance of the evidence, while the Brother's counsel argued the Trustee must establish his claims by clear and convincing evidence in order to prevail. The Court declines to determine a standard at this time because the Trustee has failed to meet his burden even under the lower preponderance of the evidence standard.

[28] *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1339 (D. Utah 1998).

Among the eleven badges of fraud listed in the UFTA, the Trustee argues that four apply to the Transfers at issue thus establishing a fraudulent intent on the part of the Debtor. Specifically, the Trustee argues that the Transfers were to an insider,[29] that the Debtor retained possession of the property transferred,[30] the Transfers were concealed,[31] and the Debtor was insolvent at the time of the Transfers.[32] As stated above, the Trustee is incorrect in some of his assertions. The Debtor did not retain possession of the property [the $1,000 and the $16,000 trade-in credit] after the Transfers, and the fact that the agreement to purchase the First Porsche was never formalized does not mean that the Transfers were concealed.

As for the two remaining badges of fraud that the Trustee asserts in support of his claim, it is undisputed that the Transfers were made to an insider and the parties have already stipulated that the Debtor was insolvent at the time of the Transfers. These two badges alone, however, do not persuade the Court that the Transfers were made with the actual intent to defraud especially since other factors outweigh such an inference. Specifically, the fact that the Brother paid reasonably equivalent value for the First Porsche, the Debtor was reimbursed for making the $1,000 down payment, and the Debtor was acting as a creditor in the Transfers at issue all lead the Court to conclude that neither the Debtor nor the Brother actually intended to defraud creditors. The Court is simply unwilling to infer a fraudulent intent on the part of the Debtor in light of these preponderating factors. Therefore, the Trustee has failed to establish that the

---

[29] Utah Code Ann. § 25-6-5(2)(a).

[30] Utah Code Ann. § 25-6-5(2)(b).

[31] Utah Code Ann. § 25-6-5(2)(c)

[32] Utah Code Ann. § 25-6-5(2)(i)

ORDER SIGNED

Transfers were made with the actual intent to defraud and they may not be avoided under § 548(a)(1).

### III. CONCLUSION

The Trustee has failed to show that the Transfers were made with the actual intent to defraud creditors under either § 548 or the UFTA, or that they were preferential under § 547. The Court, therefore, holds that the Transfers were neither preferential nor fraudulent, and the Trustee may not avoid them. A judgment dismissing the Complaint will issue contemporaneously herewith.

_____END OF DOCUMENT_____

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW** will be effected through the Bankruptcy Noticing Center to each party listed below.

Andrew B. Clawson
Adam Affleck
Prince, Yeates & Geldzahler
City Centre I, Suite 900
175 East 400 South
Salt Lake City, UT 84111
    *Attorneys for Trustee*

Kenneth A. Rushton
99 West Main Street, 3202
Lehi, UT 84043
    *Trustee*

Stephen A. Rupp
McKay, Burton & Thurman
170 South Main Street, Suite 800
Salt Lake City, UT 84101
    *Attorney for Defendant*